**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **EMBRAER AIRCRAFT MAINTENANCE** | ) | |
| **SERVICES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:13-cv-0059** |
| | ) | **Judge Aleta A. Trauger** |
| **AEROCENTURY CORP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Embraer Aircraft Maintenance Services, Inc. ("Embraer") has filed a Motion for Summary Judgment (Docket No. 96), to which AeroCentury Corp. ("AeroCentury") has filed a Response (Docket No. 103), Embraer has filed a Reply (Docket No. 112), and Embraer has filed a Surreply (Docket No. 116). AeroCentury has filed a Motion for Leave to Amend its Answer (Docket No. 114), to which Embraer has filed a Response (Docket No. 117). For the reasons set out herein, Embraer's motion will be granted in part and denied in part, and AeroCentury's motion will be denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

Embraer is an aircraft maintenance company headquartered in Nashville, Tennessee. AeroCentury is a California-based company that owns and leases aircraft. At some point before October 2011, AeroCentury leased a SAAB-SANIA Model SAAB 340B aircraft to Colgan Air, Inc. ("Colgan"), for use in Colgan's regional airline business. Pursuant to the lease agreement between AeroCentury and Colgan, Colgan was required, at the conclusion of the lease, to perform or obtain a "lease return inspection"—also referred to as "heavy maintenance"—before returning the plane to AeroCentury. (Docket No. 108 ¶¶ 3–4.) Colgan was permitted, under its

lease, to perform the heavy maintenance itself or through a contractor of its choice. It chose to contract with Embraer. Colgan delivered the craft to Embraer's Nashville facility around October 29, 2011, for heavy maintenance in advance of Embraer's returning the craft to AeroCentury. (*Id.* ¶¶ 4–6.)

Embraer performed the work but, for reasons explained below, never got paid. Under Tennessee law, a "mechanic, contractor, founder, or machinist" who performs requested "repairs or improvements" on "any . . . conveyance used in the transportation of persons or merchandise" is granted an automatic lien on the repaired vehicle if he is not paid for his work as agreed. Tenn. Code Ann. § 66-19-101. That lien—known as a "mechanic's lien"—"continue[s] for twelve (12) months after the work is finished or repairs made or material furnished and until the final decision of any suit that may be brought within that time for the debt" giving rise to the lien. Tenn. Code Ann. § 66-19-102. The two-part lifespan of the lien—lasting for at least twelve months but then continuing until the conclusion of any litigation started within that twelve months—serves as the practical equivalent of a statute of limitations. If one does not sue on the lien within twelve months of the date on which "the work is finished or repairs made," then he cannot sue on the lien at all, because it will have expired.

Embraer and AeroCentury agree that Embraer possessed a mechanic's lien on the aircraft, but they disagree regarding when the lien arose and, therefore, when it was set to expire. AeroCentury contends that Embraer's work was completed on January 20, 2012, at which point the lien's twelve months began to run.[1] In support of that assertion, AeroCentury points to a January 20 email from Embraer project manager Ed Sally to Colgan's Chris Schuping, stating that "[a]ll required work is complete on [the aircraft] at this time." (Docket No. 105-2 at 2.) Sally asked Schuping when a flight crew would be available to deliver the aircraft, suggesting that the

---

[1] Suit was filed in this court on January 25, 2013. (Docket No. 1.)

matter required Schuping's "urgent attention . . . to prevent further delay of [the aircraft's] return." (*Id.*) Embraer issued an invoice to Colgan for the work on January 25, 2013, in the amount of $351,465.20. (Docket No. 104 ¶ 46.)

Embraer, however, argues that work on the aircraft was not complete until January 28, 2012. In support of that position, Embraer relies on a Declaration of Embraer Managing Director Phil Bathurst. (Docket No. 109.) According to Bathurst,

> work is not finished until an aircraft departs Embraer's facility after the customer's flight crew conducts its final check. For its final check—"crew acceptance"—the crew verifies that all work is finished and properly documented, before signing off on the aircraft's flight logs. If a crew identifies any discrepancies, they document them in the flight logs. Afterwards, Embraer performs maintenance or repairs, as may be required. When the crew accepts the aircraft, without any discrepancies, and not before, Embraer's work is finished.[2]

(*Id.* ¶ 4.) Bathurst points out that Embraer retained the aircraft for several days after January 20, 2012, and even discovered a fuel leak on January 26, 2012. Embraer informed Colgan of the leak but decided, in consultation with Colgan, that the leak was within acceptable parameters. Colgan's flight crew finally accepted the aircraft and took it from Embraer's facility on January 28, 2012. (*Id.* ¶ 5.)

On April 1, 2012, Colgan filed for Chapter 11 bankruptcy in the Southern District of New York, having never paid its $351,465.20 invoice from Embraer. (Docket No. 104 ¶ 50.) In addition to Colgan's outstanding debt to Embraer, Colgan also, at the time of its bankruptcy filing, owed AeroCentury "significant sums of money" related to the lease of the aircraft. (Docket No. 108 ¶ 15.)

---

[2] AeroCentury suggests that this testimony should be disregarded because it supposedly contradicts Bathurst's earlier deposition testimony suggesting that the work was "completed" on January 25. (*See* Docket No. 116 at 2.) That discrepancy, however, appears to be attributable to ambiguity regarding the meaning of "completion." The court will not disregard the testimony.

On April 9, 2012, Colgan surrendered the aircraft to AeroCentury. (Docket No. 104 ¶ 51.) The next day, Embraer filed a Notice of Lien against the aircraft with the Federal Aviation Administration ("FAA"). Embraer suggests that, although its lien was perfected, it was unable to attach the aircraft because it did not know where the aircraft was. AeroCentury responds by pointing out that Bathurst admitted, in his deposition, that Embraer made no effort, at the time, to repossess the aircraft. (Docket No. 104 ¶ 53; Docket No. 106-1 at 51–52.) Embraer provided notice of its lien to both Colgan and AeroCentury. (Docket No. 104 ¶¶ 54–55.)

Meanwhile, both companies sought to receive whatever payment they could via Colgan's bankruptcy. Embraer filed a Proof of Claim based on the unpaid invoice, and the proof of claim was approved. Embraer ultimately received a distribution of $1,143.87—about 0.3% of the amount owed under the invoice. (*Id.* ¶¶ 57–58; *see also* Docket No. 40-1 (Proof of Claim).) AeroCentury also filed a Proof of Claim, and the amount it received from the bankruptcy estate was also "nominal." (Docket No. 108 ¶ 16.)

On January 25, 2013, Embraer filed its initial Complaint in this case, seeking to foreclose on the aircraft. (Docket No. 1.) Specifically, Embraer requested that the court direct the sale of the Aircraft by the U.S. Marshal Service, apply the proceeds of the sale to the indebtedness owed to Embraer by Colgan, and order AeroCentury to surrender full and peaceful possession of the Aircraft and its title to the new owner. (*Id.* at 4.) AeroCentury waived service of the Complaint and filed a Motion to Dismiss. (Docket Nos. 5 & 8.) On June 10, 2013, Embraer filed a Motion for Leave to File Amended Complaint (Docket No. 20), which AeroCentury opposed (Docket No. 22). While those motions were pending, AeroCentury leased the aircraft to a Ukrainian airline, Private Corporation International Joint Stock Aviation Company URGA ("URGA"), which took the aircraft outside the United States. (Docket No. 104 ¶¶ 64–65.) At the time,

AeroCentury did not disclose to URGA that the aircraft was subject to a lien by Embraer. (Docket No. 104 ¶ 67.) AeroCentury's Rule 30(b)(6) witness, Frank Pegueros, explained in his deposition that AeroCentury did not disclose the lien because "it was a lease, not a sale," and disclosing liens was "not an obligation under the lease." (Docket No. 98-1 at 68.) On November 4, 2013, the court granted Embraer's Motion for Leave to Amend and denied AeroCentury's pending Motion to Dismiss as moot. (Docket No. 23.) After AeroCentury delivered the aircraft to URGA, it removed the craft from United States aircraft registration, because it would be based and operated overseas. (Docket No. 108 ¶ 32.)

On March 25, 2014, URGA exercised a purchase option in its lease, buying the aircraft from AeroCentury for $1,360,000. AeroCentury did not immediately inform the court or Embraer of the sale. (Docket No. 104 ¶¶ 69–70.) The purchase agreement between AeroCentury and URGA stated that the aircraft was "free and clear of Liens" except those in the agreement's Attachment F. (Docket No. 60-2 at 4.) Attachment F listed two liens: a bank lien by Union Bank, NA, and the mechanic's lien at issue in this case. (*Id.* at 22.) The agreement stated that the remaining liens "shall be removed by Seller as soon as practicable after Closing," "at Seller's sole cost and expense." (*Id.* at 3–4.) AeroCentury applied proceeds from the sale of the aircraft to pay down its debt with Union Bank but did not apply any of the proceeds toward satisfying Embraer's mechanic's lien. (Docket No. 104 ¶¶ 81–82.)

Litigation continued, with neither Embraer's nor the court's knowing that the aircraft had been sold. On January 5, 2016, as part of a response in opposition to a motion for summary judgment, AeroCentury finally revealed that the aircraft had been sold and was no longer under AeroCentury's control.[3] (*Id.* ¶ 72.) AeroCentury recently admitted that, as of December 13,

---

[3] In response to the court's learning of the sale, the court certified two questions to the Tennessee Supreme Court regarding the status of the sale's proceeds under the mechanic's lien statute. (Docket

2018, it had no knowledge of the aircraft's location or of whether it had been dismantled or scrapped. (*Id.* ¶¶ 85, 87.) On December 20, 2017, Embraer filed a Second Motion for Leave to file a Second Amended Complaint, seeking to replace its now-futile foreclosure claim with two new claims—for, respectively, conversion and breach of contract—based on AeroCentury's alleged violation of the URGA purchase agreement, of which Embraer claimed to be a third-party beneficiary. (Docket No. 79.) The court granted the motion. (Docket No. 85.) AeroCentury filed its Answer to the Second Amended Complaint on March 30, 2018. (Docket No. 90.)

On December 19, 2018, Embraer filed a Motion for Summary Judgment (Docket No. 96), which AeroCentury opposes (Docket No. 103). On January 11, 2019, AeroCentury filed a Motion for Leave to Amend Answer to Second Amended Complaint and/or Amend the Scheduling Order, seeking, "out of an abundance of caution," to amend its Answer to include facts supportive of the arguments it made in response to Embraer's motion regarding the expiration date of the lien. (Docket No. 114 at 1.)

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir.

---

69.) The Tennessee Supreme Court answered the first question, regarding whether the lien extended to the proceeds, writing that a "lienholder has no statutory lien on the proceeds from the sale of the lien-subject property." *Embraer Aircraft Maint. Servs., Inc. v. AeroCentury Corp.*, 538 S.W.3d 404, 406 (Tenn. 2017). The Tennessee Supreme Court declined to answer the second question, regarding what other causes of action a lienholder might have in such a situation, as too "open-ended" to satisfy the requirements of Tenn. Sup. Ct. R. 23. *Id.*

2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. *Id.*

Accordingly, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of its claims. Once the moving party makes its initial showing, the burden shifts to the non-moving party to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

**B. Motion for Leave to Amend**

Rule 15(a)(2) of the Federal Rules of Civil Procedure states that leave to amend should be freely given "when justice so requires." In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to

the opposing party, and futility of amendment. *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005).

## III. ANALYSIS

## A. Conversion

Embraer argues that it is entitled to summary judgment on its conversion claim, because the undisputed facts show that AeroCentury's sale of the aircraft, with full knowledge of the lien and the pending lawsuit, effectively destroyed or made worthless Embraer's interest in the lien. AeroCentury argues that Embraer is not entitled to summary judgment because (1) its lien had expired by the time Embraer filed its suit; (2) Embraer cannot establish the elements of conversion because the value (if any) of its lien is a disputed fact; and (3) AeroCentury's actions did not extinguish Embraer's lien.

*1. Expiration of Lien.* The parties agree that the lifespan of the lien is governed by Tenn. Code Ann. § 66-19-102 and that, therefore, Embraer was required to file suit to enforce the lien within "twelve (12) months after the work [was] finished or repairs made or material furnished" giving rise to the lien. The timeline of events also appears to be largely undisputed, at least with regard to the particulars, if not the parties' characterizations of those particulars. Evidence suggests that, by January 20, 2012, Embraer believed that it had performed all of the heavy maintenance required under its contract with Colgan. The uncontradicted evidence also suggests, however, that both Embraer and Colgan understood that the parties' transaction would include a review, by Colgan's flight crew, of Embraer's work, followed by Embraer's supplementation and modification of that work, as necessary, until the craft was accepted by Colgan. That acceptance did not occur until January 28, 2012. Embraer filed its Complaint on January 25,

2013—more than a year after Embraer informed Colgan that the heavy maintenance was done but less than a year after Colgan accepted the aircraft. The only issue in dispute, then, is the interpretation of Tenn. Code Ann. § 66-19-102—specifically, the phrase "after the work is finished or repairs made." If that phrase refers only to the physical performance of the contracted-for maintenance or repairs, then the lien may have arisen on January 20 and expired a few days before the suit was filed. If the "work" described in Tenn. Code Ann. § 66-19-102 is, instead, read to include the eventual lienholder's participation in the process of the client's reviewing and accepting the work, then Embraer filed suit in time to preserve the lien.

Under Tennessee law, the first step in construing a statute is to "look to the plain language of [the] statute and give effect to the ordinary meaning of the words." *State v. Denton*, 149 S.W.3d 1, 17 (Tenn. 2004) (citing *State v. Jennings*, 130 S.W.3d 43, 46 (Tenn. 2004); *Cohen v. Cohen*, 937 S.W.2d 823, 827 (Tenn. 1996)). The court should "endeavor to construe statutes in a reasonable manner," with the understanding that the court's ultimate goal is to "ascertain and effectuate the Legislature's intent." *State v. Henderson*, 531 S.W.3d 687, 692 (Tenn. 2017) (citing *Baker v. State*, 417 S.W.3d 428, 433 (Tenn. 2013)). "[I]f the language of a statute is ambiguous," the court "must look to the entire statutory scheme" to determine the most persuasive reading of the ambiguous language in the context of the scheme as a whole. *Id.* (citing *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn. 2010); *State v. Wilson*, 132 S.W.3d 340, 341 (Tenn. 2004)).

On its face, the language of Tenn. Code Ann. § 66-19-102 is amenable to either party's proposed interpretation. "Work" has a wide array of meanings and, on one hand, could conceivably refer only to the physical work performed on the aircraft, as AeroCentury posits. Indeed, that seems to be the way Chris Sally was using the word in his January 20 e-mail to

Colgan. The more natural interpretation of Tenn. Code Ann. § 66-19-102, however—and the one that makes the most sense in the broader structure of the mechanic's lien law—is that "work" refers to both the maintenance performed and the ancillary labor spent reviewing the maintenance with the customer prior to the customer's acceptance of the aircraft—at least where that review-and-acceptance process was contemplated by both parties and occurred in a timely manner after all other work was completed. The ultimate subject of the mechanic's lien statute is not physical labor in and of itself, but rather securing payment for services performed. Completion of the service, therefore, not the performance of any particular task, signals the date on which the lien arises. *See TWB Architects, Inc. v. Braxton, LLC*, No. M2013-02740-COA-R3CV, 2014 WL 5502401, at *8 (Tenn. Ct. App. Oct. 30, 2014) (explaining that the statute allows a party "to bring a lien enforcement action up to one year after the [work is] complete"). Working with Colgan's flight crew to review the maintenance and come to an agreement that all necessary tasks had been performed was part of the service Embraer provided. Only after Colgan's personnel accepted the plane could Embraer have known that its job was complete. That is, therefore, the date on which the lien arose. Embraer's Complaint was timely filed and based on an unexpired lien.

Because this argument fails on the merits, there is no need to consider whether AeroCentury waived the argument or is estopped from raising it, through either its delay in raising the issue of expiration of the lien earlier or its admissions, in prior filings, that the lien still existed. For the same reason, AeroCentury's Motion for Leave to Amend Answer will be denied as futile. The court notes, however, that, even if the amendment were not futile, the court would not grant leave to file it, in light of the extraordinary delay in AeroCentury's identification of the issue and the prejudice suffered by Embraer as a result. AeroCentury defends its late

raising of the lien expiration issue on the ground that it did not discover the January 20, 2012 email until the email was produced, in discovery, in September 2018. AeroCentury, though, did not propound the relevant document request until June 2018. The late receipt of the document was a result of its own slow undertaking of relevant discovery.

More importantly, it should have been apparent to AeroCentury, from as early as the January 25, 2013 filing of Embraer's Complaint, that the viability of the lien was a foundational issue and that Embraer filed its Complaint, at best, close to the last second. Indeed, the Complaint itself included Embraer's invoice, clearly dated January 25, 2012, detailing the parts and labor for which it sought payment. (Docket No. 1-1 at 3.) If an invoice for thousands of dollars of labor is entered on a particular date, it is reasonable to assume that most—and possibly even all—of that labor was performed at least a day earlier. While AeroCentury may not, at the time, have had the particular email on which it now relies, there was nothing to stop it from investigating the possibility that labor on the aircraft was completed on some day prior to January 25, 2012. Moreover, as Embraer points out, AeroCentury was aware, no later than May 22, 2015, that emails involving the aircraft existed. (Docket 117-1 at 3 (Embraer Initial Disclosures).) Nevertheless, AeroCentury did not pursue this defense for three more years. Embraer has now been forced to defend its lien for several years, in both this court and the Tennessee Supreme Court. Allowing AeroCentury to redefine the case at this late date would not be consistent with the interests of justice.

In any event, all of the confusion surrounding this issue is merely more evidence that it is preferable to construe Tenn. Code Ann. § 66-19-102 as causing a lien to arise at the full completion of the service at issue, not the completion of the underlying physical labor. The date and time of completion of the physical labor may be difficult to document or identify, whereas

the customer's acceptance of the completed work is likely to be a comparably easily identifiable occurrence, the date of which should be known to both lienholder and client.

*2. Value of the Lien.* "Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights." *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) (citing *Barger v. Webb*, 391 S.W.2d 664, 665 (Tenn. 1965); *Lance Prods., Inc. v. Commerce Union Bank*, 764 S.W.2d 207, 211 (Tenn. Ct. App. 1988)). Under Tennessee law, a party seeking to establish a conversion claim must prove: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. *Id.*; *accord Kinnard v. Shoney's, Inc.*, 100 F. Supp. 2d 781, 797–98 (M.D. Tenn. 2000). AeroCentury argues that Embraer has not satisfied these elements because it has not established that its lien, even if unexpired, had any value. Because a lien is a wholly abstract right, AeroCentury's argument seems to go, a lien with zero value would be, effectively, a nullity and could not be subject to conversion.

In support of this argument that the value of the lien is uncertain, AeroCentury points to the fact that Embraer has not produced evidence establishing that its heavy maintenance increased the value of the aircraft. AeroCentury's argument, however, misunderstands the nature of the lien. The origin of the lien was a failure to pay for services rendered. It does not matter whether the heavy maintenance made the aircraft more valuable in the abstract. What matters is that Colgan contracted for Embraer to perform the work, Embraer performed it, and Embraer was not paid. Whatever Embraer's work was worth in some abstract sense, the uncontradicted evidence suggests that it was worth $351,465.20 to Colgan.

AeroCentury next suggests that, even if the lien had some value, that value is an issue of disputed material fact. AeroCentury, however, does not point to any evidence suggesting that Embraer's $351,465.20 invoice was miscalculated or in any other way incorrect. AeroCentury has had over half a decade to examine that number and find any discrepancies or errors, and it identifies none. Summary judgment to Embraer, therefore, would not be prevented by any uncertainty regarding the value of its lien.

*3. Extinguishment of the Lien.* Tennessee courts have recognized that an owner of tangible property subject to an encumbrance, such as a lien or security interest, can commit the tort of conversion by disposing of that property in a way that makes it impossible for the owner of the encumbrance to vindicate its interest. *See, e.g.*, *Rent-A-Car Co. v. Belford*, 45 S.W.2d 49, 52 (Tenn. 1931). For example, in *First Tennessee Production Credit Association v. Gold Kist, Inc.*, 653 S.W.2d 418 (Tenn. Ct. App. 1983), the plaintiff had a perfected security interest in a crop of soybeans. The defendant purchased the crop and commingled it with the defendant's own soybeans. The Tennessee Court of Appeals recognized that the plaintiff had a conversion claim against the defendant for damages. *Id.* at 422.

Embraer likens this case to *Rent-A-Car Co. v. Belford*, in which the Tennessee Supreme Court recognized a claim for conversion by a lienholder who had a lien against an automobile that the defendant sold to a bona fide purchaser who had no knowledge of the lien. 45 S.W.2d at 52. AeroCentury points out, however, that *Belford* involved the sale of a vehicle to a party who was unaware of the lien and against whom the lien could not be enforced due to the state's "policy . . . to discourage secret liens, as against innocent purchasers and creditors." *Id.* at 51 (citations omitted). The lien in that case, therefore, was fully extinguished as a matter of law. URGA, in contrast, was informed of the existence of the lien at the time of sale, and the sale

documents specifically acknowledged that the lien would survive the sale. The mechanic's lien statutes explicitly recognize a difference between purchasers with notice and those without, providing that "[t]he lien shall not extend to . . . the right and title acquired by a purchaser *without notice*." Tenn. Code Ann. § 66-19-101(1) (emphasis added). By implication, a mechanic's lien will extend to the right and title of a purchaser who buys a conveyance with knowledge of the lien's existence. The relevant statutes, therefore, appear to contemplate that a covered vehicle can be sold to a third party as long as adequate steps are taken to preserve the lienholder's interest. Embraer has identified nothing in the statutory scheme that would forbid such sales, and the court is aware of no general principle that would treat the sale of a vehicle subject to a disclosed lien as, categorically, a wrongful extinguishment of the lien.

Embraer also relies on *Allen v. Simmons Machinery Co., Inc.*, 666 S.W.2d 44 (Tenn. 1984), in which the Tennessee Supreme Court recognized a conversion claim by secured creditors based on the defendant's purchase and resale of the underlying property, a piece of strip mining equipment. *Id.* at 47–48. Specifically, the court in *Allen* recognized the conversion claim on behalf of the creditors based on a complex series of transactions, by the defendant, culminating in the defendant's "s[elling] [the equipment] out-of-state, and thereby either destroy[ing] any lien of [the creditors] or, at a minimum, ma[king] repossession and sale by [the creditors] impracticable." *Id.* at 47. The creditors' security interests at issue in *Allen*, however, are distinguishable from Embraer's lien in key ways relevant to the legal effect of the sale. First, the creditors' security agreement "prohibited sale, disposition or encumbrance of the collateral without [the creditors'] consent." *Id.* at 48. The sale in *Allen* was, therefore, categorically a default, and, like *Belford*, involved a categorical contravention of the lienholder's rights. *Id.* Nothing in the mechanic's lien statute, however, grants the lienholder veto power over a sale of

the subject property to a third party with notice of the lien. "When a lien comes into existence by force of a statute, it must be measured by the statute, and can have no greater force than the statute gives it." *Embraer*, 538 S.W.3d at 411 (quoting *Belford*, 45 S.W.2d at 51). *Allen*, therefore, involved the violation of rights that Embraer did not have.

Moreover, the creditors in *Allen* had "includ[ed] in their security interest the proceeds of the sale of collateral." 666 S.W.2d at 47. The Tennessee Supreme Court has held, in contrast, that Embraer "has no statutory lien on the proceeds from the sale of the lien-subject property." *Embraer*, 538 S.W.3d at 406. AeroCentury's exercise of dominion over the proceeds, therefore, did not implicate Embraer's interest in the manner that the exercise of dominion over sale proceeds in *Allen* did.

Moreover, even if the legal analysis in *Allen* applied here, the *Allen* court's conclusion that selling the mining equipment out of state rendered it impracticable to enforce the creditors' secured interest was a question of fact. Embraer, as the plaintiff and the party seeking summary judgment, bears the burden of establishing that the same factual conclusion is mandated in this case, which involves different parties, a different type of property, a different industry, different borders, and, perhaps most importantly, a legal and economic landscape in which over thirty years have passed. The court cannot simply assume that the challenges of enforcing a secured interest in mining equipment over state lines in 1984 are the same as the challenges of enforcing a mechanic's lien on an airplane over international lines in 2019. In order to be entitled to summary judgment, Embraer is, therefore, required to set forth facts establishing actual impracticability. It has, however, not identified any failed efforts to enforce its lien against the property since URGA's purchase of the craft or any evidence that URGA disputes the validity of the lien. To the contrary, all of the evidence before the court suggests that URGA acknowledged

the validity of the lien, as it specifically discussed the lien's future release in the purchase agreement. As AeroCentury points out, moreover, both the United States and Ukraine are signatories of the Aircraft Equipment Protocol of the Convention on International Interests in Mobile Equipment ("Cape Town Convention"), which may provide mechanisms for international enforcement. *See Ireland v. Dodson*, No. 07-4082-JAR, 2007 WL 2461609, at *2 (D. Kan. Aug. 22, 2007) ("[T]he purpose of the Cape Town Convention is to . . . bring[] a consistent system of creditors' rights and remedies to ratifying nations that do not have legal systems as comprehensive as in the United States, and to establish an international registry operated on an electronic basis."). At the very least, Embraer has set forth no facts or legal analysis establishing that it lacks recourse under the Cape Town Convention or some other treaty.

There are few Tennessee cases addressing the requirements for establishing conversion based on a lien, and those that do exist tend to rely heavily on the facts of each specific case. The best synthesis of the case law and statutes that the court can come up with is that the buyer or seller of property subject to a lien may commit the tort of conversion through the sale and surrounding circumstances, but only if doing so rendered the lien either legally or practically unenforceable. The sale of property to an unwitting bona fide purchaser, against whom the lien could not be enforced pursuant to Tenn. Code Ann. § 66-19-101(1), would, for example, likely be sufficient to support a claim of conversion. Even if the buyer did have notice, however, the totality of the circumstances may support a claim for conversion if the sale and surrounding events, at a minimum, "made repossession and sale [of the property] impracticable"—such as by commingling the property or making it prohibitively difficult to locate. *Allen*, 666 S.W.2d at 47.

Whether AeroCentury committed conversion under that standard depends on factual questions regarding how much difficulty Embraer would have had in enforcing its lien after the sale of the aircraft to URGA. Unfortunately, the facts set forth by Embraer in support of its motion do not answer those questions sufficiently to allow the court to rule on the matter at this juncture. The sale at issue may well have made the lien more difficult to enforce. Nevertheless, Ukraine is not unreachable, and international dealings involving aircraft are presumably not uncommon. Embraer has not produced evidence establishing that enforcing its lien internationally would have been impossible or so impracticable that it was the equivalent of an extinguishment of the lien. The court, therefore, will not grant Embraer summary judgment on its conversion claim.

## B. Breach of Contract

Embraer argues that it is entitled to recover, as a third-party beneficiary, for AeroCentury's breach of its purchase agreement with URGA. The purchase agreement provides:

> Seller represents and warrants that on the date of Closing, Seller has and will transfer Seller's title to the aircraft, free and clear of all mortgages, liens, claims, charges or encumbrances, leases, security interests ("Liens") . . . except as disclosed on Attachment F ("Remaining Liens"). The Remaining Liens will be released by Seller as soon as practicable after Closing at Seller's sole cost and expense.

(Docket No. 60-2 at 3.) Attachment F describes two liens, one of which is "Mechanic's Lien for unpaid work on Aircraft for indebtedness incurred by Colgan Air filed with the US Federal Aviation Administration." (*Id.* at 22.)

The Purchase Agreement expressly provides that it is to be construed under California law. (*Id.* at 8.) Pursuant to California Civil Code § 1559, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." The word "expressly," by judicial interpretation, has come to mean merely the negative of

"incidentally"; it does not require that the contract contain language specifically acknowledging that it is enforceable by a third party. *Prouty v. Gores Tech. Grp.*, 18 Cal. Rptr. 3d 178, 184 (Cal. Ct. App. 2004) (citations omitted). Under California law, "[a] third party qualifies as a beneficiary under a contract if the parties intended to benefit the third party and the terms of the contract make that intent evident." *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1161 (9th Cir. 2010) (quoting *Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821–22 (9th Cir. 1985)). Whether the third party is an intended beneficiary "involves construction of the intention of the parties, gathered from reading the contract as a whole in light of the circumstances under which it was entered." *Id.* (quoting *Prouty*, 18 Cal. Rptr. 3d at 184).

Embraer argues that it is a third-party beneficiary of the purchase agreement, because the agreement expressly identifies its lien and requires that the lien be released, at AeroCentury's expense, "as soon as practicable" after the closing of the sale. AeroCentury argues that Embraer is not a third-party beneficiary of the purchase agreement but rather, merely, an incidental beneficiary. The court has already recognized the apparent viability of Embraer's third-party beneficiary theory, in light of the language of the contract, in its Memorandum of March 6, 2018. (Docket No. 84 at 8.) AeroCentury, however, has renewed its position in the context of opposing the Motion for Summary Judgment.

"Generally, it is a question of fact whether a particular third person is an intended beneficiary of a contract." *Prouty*, 18 Cal. Rptr. 3d at 184 (citing *Bancomer, S. A. v. Superior Court*, 52 Cal. Rptr. 2d 435, 440 (Cal. Ct. App. 1996)). California courts, however, have recognized that the issue can be determined as a matter of law if a party's third-party beneficiary status can be ascertained "by interpreting the contract as a whole and doing so in light of the uncontradicted evidence" surrounding the contract's formation. *Id.* Here, the contract's

contemplation of, and relationship to, Embraer's lien is apparent from the plain language of the contract, and neither party has identified any contested issues of fact regarding the contract's formation that would preclude the court from determining the issue of third-party beneficiary status as a matter of law.

AeroCentury argues that California law generally divides third-party beneficiaries into either "donee beneficiaries" and "creditor beneficiaries" and that Embraer's claim fails because neither category encompasses the situation at issue in this case. A donee beneficiary is "a party to whom a promisee intends to make a gift . . . of a promisor's performance." *Souza v. Wetlands Water Dist.*, 38 Cal. Rptr. 3d 78, 90 (Cal. Ct. App. 2006). It is clear that that is not what happened between AeroCentury and URGA—AeroCentury's sale of the aircraft was by no means intended as a gift to Embraer.

"A creditor beneficiary is a party to whom a promisee owes a preexisting duty which the promisee intends to discharge by means of a promisor's performance." *Lake Almanor Assocs. L.P. v. Huffman-Broadway Grp., Inc.*, 101 Cal. Rptr. 3d 71, 75 (2009) (citation omitted). AeroCentury argues that Embraer cannot be a creditor beneficiary, because neither AeroCentury nor URGA owed Embraer any money; rather, any liability to Embraer was tied to the aircraft itself. The fact that AeroCentury and URGA did not owe Embraer any money, however, did not mean that they did not owe Embraer duties sufficient to support a creditor beneficiary designation or the equivalent thereof. As the court has explained, AeroCentury, as the owner of property against which Embraer had a valid lien, owed Embraer duties with regard to the preservation of the property and the safeguarding of Embraer's interest. Through the purchase agreement, AeroCentury liquidated the aircraft into funds that might have been applied to the lien—and indeed were applied to another lien. More importantly, AeroCentury created a new,

enforceable obligation on AeroCentury's part to resolve the lien—something Embraer had been trying for years to accomplish. The duties to preserve the property and protect Embraer's interest, in turn, passed to URGA. In other words, both parties to the agreement had, at different times, duties to Embraer that the agreement addresses. The agreement passed those duties to URGA but simultaneously created a new duty, by AeroCentury, to discharge URGA's responsibilities at its own expense. The court sees no reason that such a situation should be treated differently from one involving a contract to discharge a personal debt to a third party.

AeroCentury argues, finally, that, even if Embraer was an intended third-party beneficiary, it is not entitled to summary judgment because there are outstanding factual issues regarding what was meant by its obligation to make sure that the lien be "released . . . as soon as practicable after Closing at [AeroCentury's] sole cost and expense." "The interpretation of a written contract," however, "is generally a question of law for the court unless the foundational extrinsic evidence is in conflict." *Admiral Ins. Co. v. Superior Court*, 226 Cal. Rptr. 3d 648, 650 (Cal. Ct. App. 2017). AeroCentury has not identified any foundational extrinsic evidence relevant to the purchase agreement's lien discharge provision that is actually in dispute. Nor has AeroCentury suggested any meaningful alternative interpretation of the relevant language other than that AeroCentury had an obligation to pay off the lien. AeroCentury suggests that perhaps its duty was not to pay off the lien, but instead to discharge the lien via a settlement or a lawsuit. A settlement or lawsuit, however, would just be mechanisms through which to discharge the same underlying debt. The ultimate duty would still be the same.

Finally, AeroCentury has identified no basis for concluding that it was not practicable to pay off the lien before now. AeroCentury is, therefore, in violation of a provision intended to benefit Embraer as lienholder, and Embraer is entitled to summary judgment as to liability on its

breach of contract claim. Embraer asks the court to enter a money judgment for compensatory damages for the breach of contract, including attorneys' fees, costs, and expenses associated with its recovery. The briefing and evidence on this issue, however, is scant. The court, accordingly, will limit its grant of summary judgment to the issue of liability.

## IV. CONCLUSION

For the foregoing reasons, Embraer's Motion for Summary Judgment (Docket No. 96) will be granted in part and denied in part. Embraer will be granted summary judgment as to liability on its third-party beneficiary breach of contract claim, but not on its claim for conversion. AeroCentury's Motion to Amend Answer (Docket No. 114) will be denied.

An appropriate order will enter.

ENTER this 29th day of January 2019.

_____
ALETA A. TRAUGER
United States District Judge